UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARILYN HARRISON,
an individual,

    Plaintiff,

v.                                         CASE NO. 1:09-CV-89

SPECTRUM HEALTH              HON. ROBERT HOLMES BELL
HOSPITALS, a Domestic
Nonprofit Corporation,

    Defendant.
_____/

**OPINION**

On February 5, 2009, Plaintiff Marilyn Harrison filed a complaint against Defendant Spectrum Health Hospitals alleging that Defendant violated the Americans with Disabilities Act ("ADA") and the Michigan Persons with Disabilities Civil Rights Acts ("PDCRA") by discharging Plaintiff without "making reasonable accommodations to [her] known physical or mental limitations." 42 U.S.C. § 12112(b)(5)(A); Mich. Comp. Laws § 37.1202. This matter is before the Court on Defendant's motion for summary judgment on Plaintiff's ADA and PDCRA claims. (Dkt. No. 36.)

**I. Factual Background**

Plaintiff suffers from multiple sclerosis, and as a result she is legally blind. In 2001 Defendant hired Plaintiff as a call center nurse to field phone calls from patients seeking

emergency medical advice. The duties of a call center nurse include managing numerous phone calls, using hospital approved guidelines to assess callers' symptoms, referring callers to the appropriate resources, and becoming familiar with basic computer programs used in the administration of these duties. (Dkt. No. 37, Ex. 4.)

Plaintiff required special accommodation to adequately perform the duties of a call center nurse. Defendant, Plaintiff, and Karen Silky, a vocational counselor with the Michigan Commission for the Blind, together arranged to equip Plaintiff with a video-magnifier that enhanced the size, clarity, and color of the images on Plaintiff's computer screen, software to operate the video-magnifier, and a new twenty-one inch computer screen.

In late 2005, Plaintiff notified Defendant that her video-magnifier was not working properly. After determining that a faulty circuit was the cause of the problem, Defendant attempted to fix it but was not able to do so. In March of 2006, Plaintiff contacted Ms. Silky regarding the broken magnifier, and also expressed concern that the lighting in her work station was inadequate. Ms. Silky consulted with Defendant, and the two agreed to split the cost of a new video-magnifier and to purchase for Plaintiff a desk-lamp that would provide adequate lighting.

Until December of 2006, Plaintiff received exemplary performance reviews. (Dkt. No. 37, Smith Dep. p. 34, Ex. 9.) Plaintiff's direct supervisor, Carlene Smith, testified that Plaintiff had never been reprimanded, worked well with others, and generally exceeded performance expectations. (Dkt. No. 51, Smith Dep. p. 84-85.)

In December of 2006, Plaintiff fractured her hip and underwent surgery. She was placed on medical leave for four months. When she returned to work on April 14, 2007, she did so on the condition that she would work only two days per week, four hours per day, as she continued to recover. Despite Plaintiff's accident and surgery, Plaintiff's doctor determined that there had been no significant change in Plaintiff's vision and that there was "no reason visually that Ms. Harrison cannot successfully return to her work if the tasks have not changed significantly." (Dkt. No. 37, Ex. 10.)

Upon Plaintiff's request, Ruth Stilley, a call center supervisor, was assigned to help Plaintiff become reacquainted with her job after her absence. Ms. Stilley noticed that Plaintiff was having difficulty performing basic tasks such as using the fax machine, logging onto the computer, and opening her ZoomText software. More importantly, Ms. Stilley also observed Plaintiff mishandle calls and exercise poor clinical judgment in advising callers. Ms. Stilly did not feel comfortable allowing Plaintiff to take live triage calls on her own, and on several occasions she intervened because she felt patient safety might be in jeopardy. Ms. Stilley and Ms. Smith frequently asked Plaintiff if anything could be done to bring her back up to speed more quickly and to help her meet performance standards. Plaintiff complained that she was having difficultly reading the computer screen, and so Ms. Stilley helped Plaintiff increase the magnification of the text and adjust the height of her work station, and Plaintiff was given a new computer monitor with a special anti-glare screen. Even after these accommodations were in place, however, Ms. Stilley believed that Plaintiff was still

3

exercising poor judgment in fielding phone calls. On May 26, 2007, Ms. Stilley completed an employee evaluation of Plaintiff that rated her performance at an "unsatisfactory" and "unsafe" level. (Dkt. No. 37, Ex. 12.) On May 31, 2007, Plaintiff received a written warning for below average performance and for "compromising patient safety." (*Id.* at Ex. 13.)

In June of 2007, Defendant implemented a new computer software program, and required all call center nurses to attend training sessions explaining how to use it. All of Plaintiff's special equipment was moved to the training room, and Heather Fritz was assigned to be Plaintiff's instructor. Although most call center nurses were trained as groups for a total of eight hours, Plaintiff received one-on-one training that lasted sixteen hours. Ms. Fritz expressed concern that Plaintiff was not able to mentally comprehend the new system, though Plaintiff asserts that any problems she was having were entirely attributable to her inability to see the computer in the training room. Plaintiff informed Ms. Fritz of her visual difficulties, though nothing was done to address them until Plaintiff's last day of work when, upon Plaintiff's request, a technician adjusted the contrast of the screen which enabled Plaintiff to see it better.

On June 26, 2007, Plaintiff was discharged, primarily because she was "unable to navigate the new software independently" and because she was unable to "manage calls in a safe manner." (*Id.* at Ex. 16.) Plaintiff brought this action pursuant to the ADA and PDCRA on February 5, 2009, and Defendant filed the present motion for summary judgment on December 4, 2009.

4

## II. Law and Analysis

*1. The Contractual Limitations Period*

Part of Plaintiff's employment contract contains a provision stating: "I agree that any dispute arising out of my employment or termination of employment must be brought within six months of the event regardless of any Statute of Limitations to the contrary." (Dkt. No. 37, Ex. 2.) Plaintiff was discharged on June 26, 2007, yet she did not bring suit until February 5, 2009.

Defendant argues that the six-month contractual limitations period bars Plaintiff's PDCRA claim.[1] (*Id.* at 15.) A contractual limitations provision bars a PDCRA claim as long as the limitations provision is valid and the limitations period is reasonable. *Myers v. W.-S. Life Ins. Co.*, 849 F.2d 259, 260-62 (6th Cir. 1988); *Cole v. Fed. Exp. Corp.*, No. 06-3485, 2008 WL 4307090, at *9 (E.D. Pa. Sept. 19, 2008); *Lewis v. Harper Hosp.*, 241 F. Supp. 2d 769, 773 (E.D. Mich. 2002); *see also Order of United Commercial Travelers of Am. v. Wolfe*, 331 U.S. 586, 608 (1947).

---

[1]At oral argument, Defendant clarified that it does not assert that the six-month contractual limitations period bars Plaintiff's ADA claim. Before an employee can bring a private civil action under the ADA, she must file a complaint with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the action giving rise to the complaint. 42 U.S.C. § 2000e-5(e)(1). The EEOC then decides whether to pursue its own civil action against the employer. If the EEOC declines to pursue a civil action, it issues a Notice of Right to Sue to the employee. The employee then has ninety days from the receipt of the Notice of Right to Sue to file a civil action against the employer. 42 U.S.C. § 2000e-5(f)(1). A six-month contractual limitations period would interfere with the time periods governing the requirement that an employee seek and receive approval to sue under the ADA from the EEOC. For this reason, many courts have found that a six-month contractual limitations period does not bar claims pursuant to the ADA. *E.g.*, *Cole v. Fed. Exp. Corp.*, No 06-3485, 2008 WL 4307090, at *9 (E.D. Pa. Sept. 19, 2008); *Mabry v. W. & S. Life Ins. Co.*, No. 1:03 CV 848, 2005 WL 1167002, at *2-7 (M.D.N.C. April 19, 2005).

Plaintiff argues that the six-month contractual limitation period is not valid or reasonable because, even though she signed the employment contract, she did not truly assent to the limitations provision. Plaintiff claims that the employment contract was not presented to her in a format that she could read, nor was the contract read to her before she signed it. Plaintiff submits an affidavit from her husband, in which he states that the contract was not read to Plaintiff before she signed it. (Dkt. No. 51, Ex. 4 ¶ 14.) However, there is no indication that Plaintiff's husband was with Plaintiff when she signed the contract, and so his affidavit is not based on his own personal knowledge of the occasion and is not entitled to significant evidentiary weight. *See* Fed. R. Civ. P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge . . . ."). On the other hand, Defendant submits an affidavit from Mary MacDonald, Spectrum's nurse recruiter, in which Ms. MacDonald states that she personally saw to it that Plaintiff was able to read the contract or had the contract read to her before she signed it. (Dkt. No. 54, MacDonald Decl. ¶ 9.) Ms. MacDonald's affidavit is based on personal knowledge, entitled to credibility, and, since there is no credible evidence to refute it, dispositive on the issue of whether Plaintiff was able to read the contract or had the contract read to her before she signed it. However, even if the Court determined that Plaintiff neither read the contract nor had it read to her before she signed it, this would not excuse Plaintiff from being bound by the six-month limitations period. It was Plaintiff's responsibility to ensure that she was aware of and understood the terms of the contract before she signed it, and she has not presented a reasonable justification

6

for why she did not inquire into the terms of the document that she was being asked to sign. *Scholz v. Montgomery Ward & Co., Inc.*, 468 N.W.2d 845, 848-49 (Mich. 1991) ("The stability of written instruments demands that a person who executes one shall know its contents or be chargeable with such knowledge . . . in the absence of circumstances fairly excusing his failure to inform himself." (quoting *Sponseller v. Kimball*, 224 N.W. 359, 360 (Mich. 1929)). For the foregoing reasons, Defendant is entitled to summary judgment on Plaintiff's claim under the PDCRA because of the contractual six-month limitations period, but the limitations period does not bar Plaintiff's claim under the ADA. *See supra* note 1.

2. *The Doctrine of Estoppel*

On November 4, 2007, Plaintiff applied for Social Security Disability (SSD) benefits from the Social Security Administration. As a pre-requisite to her receipt of SSD benefits, Plaintiff was required to attest that she was unable to work. (Dkt. No. 37, Ex. 18.) As part of her instant claim under the ADA, however, Plaintiff is required to prove that she is, in fact, able to perform the essential functions or her job, at least if given reasonable accommodations. 42 U.S.C. § 12111(8). Defendant argues that Plaintiff is estopped from claiming that she is able to do her job for purposes of her ADA claim in light of her admission, made pursuant to her claim for SSD benefits, that she is not able to do her job.

The Supreme Court has directly addressed Defendant's argument. The rule is that a plaintiff may seek disability insurance benefits and simultaneously pursue a claim under the ADA as long as the plaintiff explains why she would be able to perform her job with

7

reasonable accommodations, a requirement of the ADA, but she would not be able to perform her job without reasonable accommodations, a requirement of the SSA. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 795-96 (1999).

Plaintiff asserts that she was justified in filing for social security benefits because, in light of the nature of her affliction — multiple sclerosis and blindness — it would be impossible for Plaintiff to perform the essential functions of a call center nurse, or engage in other gainful employment, without reasonable accommodations such as special computer hardware and software. Plaintiff also asserts that she is entitled to pursue a claim under the ADA because with the aforementioned accommodations Plaintiff is able to adequately perform the essential functions of a call center nurse. Plaintiff directs the Court's attention to her exemplary employment reviews prior to her medical leave for hip surgery in 2007 to support this assertion.

Plaintiff has satisfied the requirement set forth in *Cleveland* that a plaintiff both claiming SSD benefits and asserting a claim under the ADA explain why the two claims are not inconsistent. It is entirely plausible that reasonable accommodations are the difference between Plaintiff's ability to adequately perform the duties of a call center nurse and her inability to perform such duties. The doctrine of estoppel does not bar Plaintiff's claim under the ADA.

*3. The Merits of Plaintiff's ADA claim*

To establish a prima facie case of disability discrimination under the ADA, Plaintiff must show that: (1) she is disabled; (2) she is otherwise qualified for the position, with or

without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008). There is no dispute that four of the five elements of Plaintiff's prima facie case are satisfied. Plaintiff is disabled because medical blindness is a recognized physical disability. Plaintiff suffered an adverse employment decision because she was discharged. Defendant knew of Plaintiff's disability because it was disclosed during the application process. Finally, the position remained open after Plaintiff's discharge. Thus, the central issue is whether Plaintiff is otherwise qualified to perform the "essential functions" of the position of call center nurse, with or without reasonable accommodation. 42 U.S.C. § 12111(8). Defendant argues that, as a matter of law, after Plaintiff's return from medical leave she was not qualified to perform two essential functions of the position even with reasonable accommodation: (1) the ability to competently navigate the computer program for call center nurses, implemented in June of 2007; (2) the ability to follow hospital-approved guidelines in assessing patient symptoms and dispensing medical advice.

1. The ability to competently navigate the computer network

Defendant first argues that it is entitled to summary judgment on Plaintiff's ADA claim because, even with reasonable accommodation, Plaintiff was not able to competently navigate the computer network used by call center nurses, and that Defendant was permitted

9

to terminate her for this reason. As a preliminary matter, it is important to note that the ability to understand and operate the necessary computer programs is an "essential function" of a call center nurse's occupation. Courts generally defer to an employer's judgment in identifying the essential functions of an occupation, *see* 42 U.S.C. § 12111(8), and Spectrum's official job description form for a call center nurse requires that nurses "possess computer skills including a basic knowledge of selected Microsoft Office products (Word, and Outlook), Telehealth, and be general familiarity [sic] with any other applications as may be required by departmental management." (Dkt. No. 37, Ex. 4.)

Though Defendant presents evidence that Plaintiff had difficulty understanding and operating the program used by the clinical call center before June of 2007 ("old program"), it appears that these problems were solved when Defendant helped Plaintiff increase the magnification of the text, adjust the height of her workstation, and obtain a new computer monitor with an anti-glare screen, all in May of 2007. Indeed, Defendant does not argue that Plaintiff was unable to operate the old program after the accommodations were made in May, and this was not a reason for Plaintiff's termination. Rather, Defendant's concerns stemmed from Plaintiff's alleged inability to operate the program implemented by the clinical call center in June of 2007 and used thereafter ("new program").

In instructing Plaintiff on how to use the new program, Ms. Fritz observed Plaintiff struggle with basic tasks such as logging onto the computer and navigating through the applications. (Dke. No. 37, Frtiz Decl. ¶ 9.) Though Ms. Fritz recognized that Plaintiff "was

10

able to verbalize how the process worked," Ms. Fritz characterized Plaintiff's problems as a fundamental inability to "grasp[] the computer concepts" of the new program. (*Id.* at ¶ 8.)

Plaintiff argues that the problems were not the result of Plaintiff's inability to grasp the computer concepts, but of Plaintiff's inability to see what was in front of her. This argument has merit. First, if Plaintiff was able to "verbalize" the new program, she presumably understood it. Second, while it is true that Plaintiff did have access to all her special equipment in the training room, suggesting that Plaintiff should have been able to see as well as she had in the call center, even Defendant does not dispute that variations in lighting could substantially adversely affect Plaintiff's ability to see. (Dkt. No. 37, at 5-6.) It is reasonable to believe that the lighting in the training room was different than it was in the call center, even if only slightly, and for this reason Plaintiff experienced visual problems in the training room that she had not experienced in the call center with the same special equipment. Finally, Plaintiff presents evidence that, after a technician altered the black/white contrast on her computer screen, she was able to see the screen and operate the new program without problem. Thus, at a minimum there is a genuine issue of material fact as to whether Plaintiff's problems catching on to the new system were attributable to her inability to see the program and the instructions rather than her inability to understand them.

Nevertheless, Defendant argues that, even if Plaintiff's problems were attributable to her inability to see, there were no reasonable accommodations that would have remedied those problems and permitted her to adequately operate the new system. As mentioned

above, on Plaintiff's final day of work, a technician altered the black/white contrast on her computer screen, and this "accommodation" enabled her to see and navigate the new program. Defendant argues that this accommodation cannot qualify as the "reasonable accommodation" that could have been provided to Plaintiff, however, because Plaintiff never asked any supervisors to adjust the contrast throughout the several weeks she was in training. Defendant argues that it cannot be expected to have provided an accommodation that had not been requested. This argument fails, however, because, even though an employee is largely responsible for identifying the accommodations that will be necessary for the employee to perform the essential functions of the job, the employer is not completely absolved from attempting to identify helpful accommodations on its own. 29 C.F.R. Pt. 1630, App'x ("[T]he employer must make a reasonable effort to determine the appropriate accommodation."). In this case Defendant does not dispute that, although Plaintiff did not request an adjustment of the screen contrast until her final day of work, she did on several occasions notify her supervisors of her inability to see in the training room. There is a genuine issue of material fact as to whether it would have been "reasonable" to require Defendant to accommodate Plaintiff by adjusting her screen to a contrast that she could see, an undeniably easy fix, even though Plaintiff did not specifically request this accommodation in a timely manner.

The above analysis indicates that questions of fact preclude the Court from concluding that, as a matter of law, Plaintiff could not have performed the essential function of operating

the new program when aided by reasonable accommodation, such as an alteration of the black/white contrast on her computer screen. However, operation of the new program is not the only essential function of a call center nurse's occupational duties, nor is Plaintiff's failure to operate the new program the only reason Defendant discharged Plaintiff. Defendant also discharged Plaintiff because of her inability to follow hospital-approved guidelines in assessing patient symptoms and dispensing medical advice.

2. The ability to follow hospital-approved guidelines in assessing patient symptoms and dispensing medical advice

Defendant next argues that it is entitled to summary judgment on Plaintiff's ADA claim because, even with reasonable accommodation, Plaintiff was not able to follow hospital-approved guidelines in assessing patient symptoms and dispensing medical advice, and that Defendant was permitted to terminate her for this reason. Offering safe and sound advice is undeniably an essential function of a call center nurse's job.[2] (Dkt. No. 37, Ex. 4.) Defendant directs the Court's attention to several instances in which Plaintiff mishandled calls and/or provided harmful and potentially life-threatening advice to callers. For example, Plaintiff suggested that a caller give his seven-month-old son Benadryl, even though the dosage chart indicated that Benadryl should not be given to children under twelve months; Plaintiff failed to immediately instruct a caller to take her son to the emergency room when

---

[2] Notably, even the ADA itself acknowledges that if an employee poses a "direct threat to the health or safety of other individuals in the workplace," and if the threat cannot be eliminated by reasonable accommodations, then the employee, as a matter of law, is not an individual that is otherwise qualified to perform the essential functions of her job. 42 U.S.C. § 12113(b); 42 U.S.C. § 12111(3); *Mauro v. Borgess Med. Ctr.*, 137 F.3d 398 (6th Cir. 1998).

13

the son could be heard in the background struggling to breath; Plaintiff failed to assess whether a caller's husband was demonstrating life-threatening symptoms before obtaining his medical history; Plaintiff used the wrong hospital guidelines to analyze a caller's abdominal pain. (Dkt. No. 37, at 9-10, Ex. 13, Stilley Decl. ¶ 21.) Ms. Stilley, the call center nurse who monitored Plaintiff when she returned to work following her surgery, observed Plaintiff field almost sixty triage calls between April 14, 2007, and May 31, 2007, and Ms. Stilley believed that Plaintiff "was not going to improve to a level that would allow her to take patient calls on her own without jeopardizing patient care." (Dkt. No. 37, Stilley Decl. ¶ 22.) On May 26, 2007, Ms. Stilley completed an employee evaluation of Plaintiff that rated her performance at an "unsatisfactory" and "unsafe" level. (*Id.* at Ex. 12.)

Plaintiff first argues that Defendant, and Ms. Stilley in particular, overstates the severity of Plaintiff's mistakes. Plaintiff points out that none of the calls cited by Defendant resulted in caller complaints or exacerbated injury to the callers. However, the mere fact that no callers complained or suffered further injury because of Plaintiff's advice does not mean that Plaintiff's handling of the calls satisfied Defendant's standards for quality and safety. In addition, as a registered nurse with almost forty years experience and a supervisor in the call center, Ms. Stilley is undoubtedly in a position to determine whether a call center nurse's handling of a call met Defendant's standards, both from a practical standpoint and a supervisory standpoint. The Court gives credence to Ms. Stilley's assessment that Plaintiff's performance after her return from medical leave was sub-par.

Plaintiff next argues that, even if Plaintiff's performance after her return from medical leave was sub-par, her errors were attributable to Defendant's failure to provide her with "reasonable accommodation" in the form of proper lighting and equipment. As discussed above, Plaintiff has presented evidence that, immediately after she returned to work on April 14, 2007, her work-site may have been lacking reasonable accommodations. However, to address Plaintiff's complaints, Defendant helped Plaintiff increase the magnification of the text on her screen and adjust the height of work station, and Plaintiff was given a new computer monitor with a special anti-glare screen. The last of these accommodations was in place by May 23, 2007. There is no evidence that Plaintiff's work conditions were inadequate, or that Plaintiff requested additional accommodations, between May 23, 2007, and June 1, 2007, the date that training for the new program began and the date Plaintiff again began to complain of inadequate accommodations. Nevertheless, between May 23, 2007, and June 1, 2007, Ms. Stilley still lacked confidence that Plaintiff was able to handle patient calls in a satisfactory manner. (*Id.* at Stilley Decl. ¶¶ 18-20.) Plaintiff cannot claim that her failure to provide safe and sound advice was attributable to Defendant's failure to provide reasonable accommodations in the form of special equipment because even during the one-week period that Plaintiff was using satisfactory equipment she continued to mishandle calls.

Finally, Plaintiff argues that, even if Plaintiff's performance after her return from medical leave was sub-par, her errors were attributable to Defendant's failure to provide her with "reasonable accommodation" in the form of sufficient time to become readjusted to the

15

job. Plaintiff began fielding calls on her first day back to work after medical leave, April 14, 2007. With the exception of a two week break in the middle of May while Plaintiff was awaiting the arrival of her new computer monitor with an anti-glare screen, Plaintiff handled almost sixty calls over the six week period between April 14 and May 26, 2007. Six weeks and sixty calls is a significant amount of training, especially in light of Defendant's evidence that it usually takes employees two to four *hours* to become readjusted to the job after a leave of absence. (*Id.* at Stilley Decl. ¶ 7.) Nevertheless, Ms. Stilley believed that the training did not improve Plaintiff's performance, and that Plaintiff's performance was not likely to improve with further training. It is worth noting that one of Plaintiff's more notable mistakes, recommending that a caller give her seven-month old son Benadryl when Benadryl should not be given to children under one, occurred toward the end of the six-week training period on May 26, 2007, suggesting Plaintiff's performance was not improving. (*Id.* at Ex. 11 p. 123.) There is no evidence that Plaintiff was not given an adequate amount of time to readjust to the job or that additional time would have made a difference. Defendant's accommodation was reasonable in this regard.

For the foregoing reasons, even with reasonable accommodations, Plaintiff was not able to perform the essential function of following hospital-approved guidelines in assessing patient symptoms and dispensing medical advice. Plaintiff has failed to establish an element of her prima facie case under the ADA. Summary judgment in favor of Defendant on Plaintiff's ADA claim is appropriate.

## III. Conclusion

The Court is extremely sympathetic to Plaintiff's situation. Nevertheless, the record reveals that Defendant more than exceeded its legal obligation to accommodate her disability throughout the full course of her employment. Call center nurses are given a unique level of public trust and confidence, and it is not unreasonable to hold a call center nurse to high performance standards in order to ensure public safety. Defendant was required to provide reasonable accommodations to Plaintiff, not extraordinary accommodations, and even after Defendant furnished Plaintiff's work station with proper lighting and equipment and provided her six weeks to re-acclimate to her position after her leave of absence, Defendant still lacked confidence in Plaintiff's ability to handle calls in a manner that satisfied Defendant's safety standards. By terminating Plaintiff for this reason, Defendant did not violate the ADA. Defendant is entitled to summary judgment on Plaintiff's ADA claim, and Plaintiff's PDCRA claim is barred by the six month contractual limitations period. An order and judgment consistent with this opinion shall be entered.


Dated: April 29, 2010                     /s/ Robert Holmes Bell
                                          ROBERT HOLMES BELL
                                          UNITED STATES DISTRICT JUDGE